Bryan, District Judge,
sitting by designation, delivered the opinion of the court:
A contract for the construction for the United States of a levee in the Florida Everglades is the source of these three *138 claims. The first involves the method of measurement of the levee embankment for computing the plaintiff’s compensation on the agreed price per cubic yard; the second, the recapture of liquidated damages charged for delay in the completion of the embankment; and the last, the right to rental for equipment while idle but held ready for the compaction of the levee earth. Adopting with a slight change the fact findings of the commissioner, we deny the claims.
On the first and third claims recourse was had to the administrative process furnished by the contract for resolution of disputes. The determinations were adverse to the plaintiff — either for want of merit or for tardiness of prosecution. In effect, denial there of the first claim, as will later appear, denied the second. None of the decisions is vulnerable as arbitrary, capricious, slighting procedural requisites or lacking in evidential support. Nor, as the further discussion will also establish, was any rejection legally offensive.
I. The point of the initial claim is that in ascertaining the cubical content of the embankment (the multiplicand to which the yardage unit price is applied) the Government did not include that part of the embankment comprised between the base of the levee — the ground exposed by the stripping of the land to receive the embankment — and the surface of the ground before the stripping. The contention of the United States is that according to the contract the measure for payment is the volume of the structure above “the natural ground surface”, that is, above the level of the ground as it existed before it was disturbed at all except for a survey.
The critical stipulation of the contract reads:
1-07 measuremeNt and patmbnt. — a. Embankment. — This item shall be measured by the cubic yard in place in the levee. The volume between the natural ground surface, as shown by the last survey made before construction commences, and the prescribed construction cross section indicated on the plans, will be paid for at the contract unit price for “Embankment.”
Altogether untenable, we think, is the plaintiff’s conception of the “natural ground surface” as the ground laid bare by the stripping. The true intendment of the phrase is exampled in the preceding specification by this sentence: “The natural ground surface on the pool side of the levee *139 shall not be disturbed”. 1-06. The meaning of the words is illustrated in the contract plans by a cross section of the embankment. There the plane of the ground before stripping is designated as “existing ground surface”. The variation in the adjective gives emphasis to what is meant by “ground surface”. This cross section is expressly referred to in 1-07, supra, evidently to accent the delineation of the surface.
“Natural ground” is also redefined by the succeeding clause of the specification, as the surface “shown by the last survey made before construction commences”. Whether “construction” refers to erection of the embankment only or to the project whole, we believe it undoubtedly includes the clearance and stripping of the ground. Hence, the natural ground surface denotes the plane of the soil as it reposed when the present undertaking began, save as a survey may have disordered it.
True, this manner of measuring a levee embankment was a departure from the customary specification: prior practice accorded with the plaintiff’s now asserted interpretation. But the change was distinctly and precisely indicated, and we must read the contract after the words of that document. Note, too, that the connotation urged for them by the plaintiff now would earlier have lost him the contract, for he would not have been the low bidder.
II. A corollary to the first, the second claim is to retrieve liquidated damages retained by the Government for delay in completing the embankment. The time for performance of this work was fixed in the contract by prescribing the cubic yardage of the embankment to be constructed on an average each month, and then using this monthly amount as a divisor into “the total quantity of material actually placed and to be paid for under the contract”; the result is the number of months and fraction of a month allowable for the work. Thus the completion period was a quotient depending upon the size of the dividend which was “the total quantity of material * * * to be paid for”.
Accepting, as we have, the smaller quantitative dividend, produced by excluding from the “pay dirt” the volume between the natural surface and the surface as stripped, the *140 term for performance of the work is correspondingly shortened. The days in excess of the short term were the basis for the Government’s assessment of the liquidated damages. Hence, no remission is justified.
III. For tamping the earthen work of the levee, the contract called for “Initial compaction” and, in the discretion of the Government, “Additional compaction”. Anticipating the possibility of this further compaction, the contractor was obligated to have certain tractor and roller equipment available for the work. The Government did direct the plaintiff to put the machines on the job and the plaintiff obeyed. Afterwards the plaintiff was notified to suspend any additional compaction operations but to keep the equipment on location.
Concededly, the suspension was within the right and privilege of the United States. The initial compaction was paid for. Now the contractor insists that it should also be compensated for the loss of the use of the equipment while in the standby status. The ready response is that definite provision is made in the contract to secure the plaintiff against loss in this very contingency.
A “lump sum price or prices” was paid the plaintiff solely for mobilizing and demobilizing the tractors and rollers, and the contractor agreed to an if-and-when-used basis for payment for the operation of the pieces. In this way the contractor was paid for the readiness of the equipment, even though it might never be called into service. That the actual utilization of the units was optional is clear in the contract: “The Contractor will therefore be required to have at his disposal equipment * * * which will be operated if, and to the extent, directed by the Contracting Officer”, and “payment for operation of the roller unit, or units, will be made at the appropriate contract unit price, or prices, for ‘Additional Compaction’ Again, conclusively, the “time during which operation of the unit is not required, will not be paid for”. All of which demonstrates that the plaintiff cannot maintain a claim for a tractor-roller’s lay-days.
Judgment must go for the defendant denying and dismissing the plaintiff’s petition.
It is so ordered.
*141 Laramore, Judge; MaddeN, Judge; Whitaker, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Marion T. Bennett, makes findings of fact as follows:
1. Plaintiff is á corporation organized under the laws of the State of Florida and its principal business is construction work. Personal supervision over the activities of the plaintiff is maintained by Mr. Fred W. Hooper, its president for thirty years and a man with much experience in construction work, including levee jobs in the Florida flood control district.
2. This case arises out of a contract between the parties, No. DA-08-123-ENG-618, dated March 5,1951, for construction by plaintiff of levees L-33 and L-37,14.84 miles long, in the Everglades section of southern Florida. The amount of the contract was stated to be $1,270,862 (estimated). There are three claims by plaintiff in this case: for additional compensation for embankment, for remission of liquidated damages and for equipment standby-time rental. The invitation to bid, dated January 15,1951, was made a part of the contract as were specifications, schedules and drawings. The drawings set forth the nature of the work and results to be achieved and contained a “Prescribed Typical Cross-Section” of the levee showing what it should look like when completed. There were amendments dated February 5, 9, and 13, 1951. The contract, plaintiff’s exhibit 1 in evidence, contained the standard provisions of Government construction contracts, including: Article 2. Specifications and Drawings; Article 3. Changes and Emtras; Article 4. Changed Conditions; Article 5. Delays-Damages; Article 6. Disputes; Article 9. Inspection, and Article 26. Termination for the Convenience of the Government.
3. The invitation for bids provided in part:
5. Bidders should carefully examine the drawings and specifications, visit the site of the work, and fully inform themselves as to all conditions and matters which can in any way affect the work or the cost thereof. *142 Should a bidder find discrepancies in, or omissions from, the drawings, specifications or other documents, or should he be in doubt as to their meaning, he should at once notify the Contracting Officer and obtain clarification prior to submitting any bid.
4. The specifications provided that, “The cost of the work, including all incidentals, shall be included in the unit prices quoted by the Contractor in his bid.” The specifications further provided under part u, general conditions :
GC-3 SITE INVESTIGATION AND REPRESENTATIONS.— The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and condition of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other materials upon which information is reasonably obtainable and which can in any way affect the work or the cost .thereof under this contract. The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and subsurface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications, made a part of this contract. Any failure by the Contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Government. Representations made but not so expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the Contractor.
*143 5. Tbe specifications also contained the following pertinent provisions under part hi, special conditions:
sc-i commencement, prosecution, and completion. — The Contractor will be required to commence work under the contract within SO calendar days after the date of receipt by him of notice to proceed and prosecute the construction of the levee (under Item 1 of the Unit Price Schedule) at an average rate of not less than 250,000 cu. yds. of embankment per month and to complete this portion of the work within the number of days after the limiting date set for commencement as determined by applying the average monthly rate above stipulated to the total quantity of material actually placed and to be paid for under the contract; provided, * * *
sc — 2 liquidated damages. — In case of failure on the part of the Contractor to complete the work within the time fixed in the contract or any extensions thereof, the Contractor shall pay the Government as liquidated damages the sum of $W0/J0 for each calendar day of delay until the work is completed or accepted.
sc — 3 estimated quanttmes. — The quantities listed on the Unit Price Schedule are estimates only. Within the limit of available funds the Contractor will be required to complete the work specified herein in accordance with the contract and at the contract price or prices whether it involves quantities greater or less than estimated.
sc — 4 payments. — Payments will be made as provided in Article 7 of the contract. Unless otherwise authorized in writing by the Contracting Officer, the items of work for which payment will be made shall be limited to those listed and enumerated in the contract. The unit prices or lump sum price or prices stated in the contract will be used in determining the amount to be paid and shall constitute full and final compensation for all the work.
*****
sc-6 physical data. — Information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for any interpretation or conclusion drawn therefrom by the Contractor.
a. Surface and subsurface conditions. — A survey of the site of the work has been made, including probings, auger and core borings in connection with the surface *144 investigation, to determine tlie elevation and conformation of the ground and the depth and character of materials expected to be encountered in the performance of the work. The depth and character of materials, as estimated from these explorations, are indicated on the contract drawings.
b. Site and weather conditions. — This project situated approximately 20 miles west of the City of Ft. Lauderdale and approximately %-rnile west of and parallel to U. S. Highway No. 27. The south end of the Íroject begins at a point on the Miami Canal in North )ade County and proceeds due north within the central limits of South Broward County west of and parallel to IJ. S. Highway No. 27 and finally joins the west end of Levee L-35 at the junction of TJ. S. Highway No. 27 and State Highway No. 84. The right-of-way throughout the length of the project is covered mostly with saw grass and maiden cane with a few scattered willows. The area is highly Inflammable during the dry season of the year. Muck and peat from 1 to 5 feet deep predominates throughout the length of the project. Under the muck and peat thin layers of marl and sand will be found in localized areas. The depth to rock varies from 1% to 5 feet throughout the entire length of the project. Portions of the right-of-way have been used for agricultural purposes and are reasonably stable during the dry season of the year. From June to November tropical storms may occur and the area inundated with up to 1 foot of water which will make working conditions difficult.
jj< ❖ ‡ *
sc-14 INSPECTION. — The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. The inspectors will direct the maintenance of the ranges, location marks and limit marks in proper order and position. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract.
******
sc-19 surveys. — a. Layout of work. — 1. The Government will establish the following base lines and bench marks at the site of the work:
Horizontal control. — One base line for the full length of the levees.
*145 Vertical control. — Bench marks not less than one mile apart. Elevation and location are shown on control data sheets of contract drawings.
2. From the base lines and bench marks established by the Government, the Contractor shall complete the layout of the work and shall be responsible for all measurements that may be required for the execution of the work to the location and limit marks prescribed in the specifications or on the contract drawings, subject to such modifications as the Contracting Officer may require to meet changed conditions or as a result of necessary modifications to the contract work.
$. The Contractor shall furnish, at his own expense, such stakes, templates, platforms, equipment, tools and material, and all labor as may be required in laying out any part of the work from the base lines and bench marks established by the Government. It shall be the responsibility of the Contractor to maintain and preserve all stakes and other marks established by the Contracting Officer until authorized to remove them, and if such marks are destroyed, by the Contractor or through his negligence, prior to their authorized removal they may be replaced by the Contracting Officer, at his discretion, and the expense of replacement will be deducted from any amounts due or to become due the Contractor. The Contracting Officer may require that work be suspended at any time when location and limit marks established by the Contractor are not reasonably adequate to permit checking of the work.
b. Quantity surveys. — 1. The Contractor shall furnish all personnel, equipment and material required to make such surveys as are necessary to determine the quantities of work performed or in place. All original field notes, computations, and other records taken by the Contractor for the purpose of quantity surveys shall be furnished promptly to the representative of the Contracting Officer at the site of the work; they shall become the property of the Contracting Officer and shall be used to the extent necessary in determining the amount of payments due to the Contractor under Article 7 of the contract.
2. Unless waived in each specific case, quantity surveys shall be made under the direction of a representative of the Contracting Officer.
6. Part IV of the specifications was entitled “Technical Provisions” and section I thereunder was designated as “Levee.” This section provided in part as follows:
*146 i-03 clearing and stripping. — The base of the levee and the surface of borrow pit used shall be cleared and stripped of all surface vegetation, including roots. Stripped material shall be wasted on the pool side of the levee or on the landside of the borrow pit, provided that no waste materials shall be placed within 10 feet of the levee toe, or within 25 feet of the borrow pit. All stumps shall be removed and all roots larger than iy2 inches in diameter shall be grubbed for a depth of 2 feet below the surface of the ground. Stripping operations shall be controlled so as to_ leave the maximum amount of peat available for use in the levee. No separate payment will be made for clearing or stripping and the cost thereof shall be included in the contract unit price for “Embankment.”
i-04 embankment. — a. Cross-section. — The levee shall be constructed to the grades and cross sections indicated on the drawings. The entire levee shall have a crown width of 10', except at turnouts, and gross side slopes of 1 on 3. A tolerance of 0.3 ft. below the specified construction grade for the crown will be allowed provided that the slopes connect as plane surfaces with the levee toes as determined by applying the required 1 on 3 slope to the specified construction grade. The Contractor will be permitted to construct the section to a higher grade, for his convenience, provided that the finished levee is free from abrupt humps or hollows, but the volume of any material lying outside of the construction cross section specified herein will not be paid for. Measurement to determine height to which levee is actually constructed will be made after dressing but prior to compaction.
*****
i-06 operations on pool side op levee. — The natural ground surface on the pool side of the levee shall not be disturbed. The Contractor will not be permitted to track any equipment outside of the poolside levee toe.
i-07 measurement and payment. — a. Embankment. — This item shall be measured by the cubic yard in place in the levee. The volume between the natural ground surface, as shown by the last survey made before construction commences, and the prescribed construction cross section indicated on the plans, will be paid for at the contract unit price for “Embankment.”
7. Modification 1 to the contract, dated April 4, 1951, which was accepted for plaintiff by its president, Mr. Fred W. Hooper, changed the slope of one side of the levee from a *147 “one on three” to a “one on two” slope, which, in turn, reduced the estimated quantity of embankment from 2,100,000 cubic yards to 1,820,000 cubic yards. It also eliminated compaction on that slope and revised items 1, 2, 8 (b), and 3 (d) of schedule I to read as follows:

The above modification reduced the total estimated consideration of the contract in the sum of $170,325.
8. Bids were opened on February 15, 1951. There were five bidders. Plaintiff submitted the low bid of $1,270,862. The defendant’s estimate was $1,000,485. Thus, the low bid exceeded the estimate by 27.02 percent, which was in excess of the amount under which the district engineer had authority to make the award. Any bid in excess of 25 percent of the Government estimate could not be accepted. Defendant’s representatives and Mr. Hooper discussed the situation and Hooper was told of his right to protest the estimate and was advised to do so.. He was given an abstract of the bids which contained an abstract of the defendant’s estimate on each of the 26 bid items. On February 20, 1951, plaintiff notified the district engineer he would protest the cost figures prepared by the design branch. On February 21, 1951, plaintiff did file a written protest. Plaintiff was of the opinion that defendant had underestimated the quantity of dynamite required for item 1, embankment, and protested also as to item 4, cofferdam and pumping; item 7, backfill on structure S-34; item 16, piling on the same structure; item 17, cofferdam and pumping on the culvert at Miami Canal, and item 20, backfill oh the latter structure. Mr. Hooper also made a trip to Washington, D. C., to discuss the matter with the Chief of Army Engineers. At no time was any question raised pertaining to the quantity of embankment involved, such item being “estimated” in the' contract and the plaintiff presuming it *148 would be paid for all embankment placed in the levee, as was its previous experience. The defendant revised its estimates upward on items 4 and 17 and this brought plaintiff’s bid within 24.64 percent of the revised estimate. Accordingly, on March 5,1951, plaintiff was notified it was awarded the contract. Notice to proceed was received by plaintiff on April 5, 1951, but plaintiff actually commenced work on March 15,1951.
9. On March 21,1951, the district engineer of the Corps of Engineers, the contracting officer, wrote plaintiff in part as follows:
I have recently awarded your company contract No. DA-08-123-Eng-618 for the construction of Levees Li-33 and L-37; Structure S-34 at North New River Canal; and a 2-Barrel Culvert at Miami Canal. The work to be done under this contract is similar to that required by your previous contracts. However, before starting construction of this job, I would like to again bring to your attention certain information now needed for the records of this office and certain requirements and job procedures which must be followed to facilitate execution of the work and to carry out the provisions of this contract.
*****
The Resident Engineer and field inspector assigned to the work are responsible to the Chief of the Construction Division who is a member of my technical staff. Instructions and interpretations of the contract requirements given by the Inspector or by the Resident Engineer shall be the same as if given by the Chief of the Construction Division. If you are of the opinion that the inspector’s demands are unfair and beyond the scope of your contract, the matter should first be referred to the Resident Engineer for a satisfactory settlement. Should there be any disagreement * * * you should then refer the controversy direct to Mr. A. H. Brown, Chief of the Construction Division of this office. * * *
10. Article 9 of the contract provides in part:
(a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by representatives of the Contracting Officer at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject *149 defective material and workmanship or require its correction. * * *
Specification sc-14, INSPECTION, is quoted in full in finding 5. Defendant’s inspectors were on the job throughout its progress from the date of the notice to proceed to completion.
11. In the construction of levees D-33 and L-37, plaintiff made various surveys as follows:
a. The survey to locate the center line of the levee.
b. The survey to locate the control or reference line.
c. The survey to locate levee stations.
d. The survey to locate preliminary guide stakes for the stripping area.
e. The survey to locate preliminary guide stakes for the borrow pit.
f. The survey to relocate the center line after stripping.
g. The survey to locate the toes of the levee.
h. The survey to determine the completed slope and height of the levee.
Plaintiff contends that all of the above surveys were required by the contract. The contract does not actually mention them. Paragraph SC-19 relating to surveys is quoted in finding 5. Only surveys to determine quantities were required to be made under direction of a representative of the contracting officer. The defendant set out the bench marks a mile apart and 500 feet off the center line of the levee, but other surveys were made by plaintiff with his own personnel, equipment and material as required by the contract. Defendant considers that all of the surveys listed above were layout surveys voluntarily determined by plaintiff to be useful and necessary to execute the contract according to measurements required. It is found that this is true except as to those identified as (g) and (h) which were employed to ascertain quantities and to see if the levee met the measurements required. Different contractors may have proceeded differently as to these surveys, especially with reference to location of the toe, depending on a contractor’s interpretation of the contract and specifications on what was meant by how much embankment would be paid for and whether it was from the surface of the ground before or after stripping. It is a fact, however, that defendant required a survey before stripping to establish the plane from which com *150 putations for pay purposes were to be made, and plaintiff made such, a survey. Plaintiff also made a survey to locate the levee toes, after stripping. These were the last surveys made by plaintiff prior to the placing of embankment in the levee.
CLAIM: POE COMPENSATION FOR ADDITIONAL EMBANKMENT
12. As noted in finding 6, paragraph 1-0S of the specifications required that the base of the levee should be stripped of all surface vegetation with the proviso that stumps and certain roots should be grubbed for a depth of two feet “below the surface of the ground.” This was necessary in order to prevent seepage under the levee. This operation caused preliminary guide stakes to be destroyed and the center line thus had to be reestablished. Also, before any embankment could be placed in the stripped-out area, plaintiff determined it to be necessary to make a survey to establish where the toe of the levee would be. The toe of the levee is the extreme outer portion of the levee on either side. The plaintiff’s position is that the location of the toe could not be established earlier because prior to stripping it was unknown how deep the toe would have to go below existing ground surface covered with materials which first had to be removed to an unknown depth. Plaintiff says that this was the “last survey made before construction commences,” as referred to in paragraph 1-07 of the specifications quoted in full in finding 6, and that construction of the levee commenced with the placing of embankment and not before. Defendant contests this view, as more fully developed hereafter. Defendant says that this survey was a layout survey for plaintiff’s convenience and not one of the two necessary quantity surveys, i. e., a survey of the “natural ground surface” or the survey of the finished cross section of the levee, both necessary to measure the volume of embankment for payment purposes.
13. Plaintiff recorded in field notebooks the data in connection with its survey to locate the toes of the levee. The first stations, 4 through 11, were thus recorded and the books were offered to the representative of the resident engineer to be used for the making of cross sections and to establish *151 what the progress payments should be. These particular books were refused by defendant’s inspector and plaintiff was instructed to furnish, in lieu thereof, field notes containing recorded data showing the range, elevation and rod readings at the point where the slope of the levee intersected the existing ground surface prior to stripping, which is also the point at which the preliminary guide stakes were placed to designate the area to be stripped. Since up through station 11 no field notes had been taken to record the data as desired by defendant, it was necessary to estimate it. This was done. Defendant notified plaintiff that it was not interested in field notes made to locate the toes at the base of the levee after stripping and before placing of embankment commenced but that progress payments would be made only for the embankment placed in the levee above the existing ground surface.
Thereafter plaintiff kept records showing data as required by defendant, which were turned over to defendant. There is no record of any protest as to this requirement at this time by plaintiff to the resident engineer, although Hooper testified he made oral protest to the contracting officer that he intended to claim for all embankment placed in the levee. The plaintiff also kept field notebooks showing the recorded data for the range, elevation and rod reading of the location of the toe at the base of the levee after stripping and before any embankment was placed therein. It did not turn over these latter notebooks to defendant. They are in evidence here.
14. It is the dispute over where the measurement of the levee embankment begins, as contemplated by the contract, which gives rise to the first claim in dispute here. The plaintiff maintains that the levee embankment should be measured on a cross-section basis from the base of the levee after stripping and clearing, and the defendant maintains that the measurement of the levee embankment should be from the existing ground level before stripping and clearing. This involves an interpretation of contract provisions heretofore quoted, particularly 1-07, measurement and payment, (a) Embankment, as set forth in finding 6. However, the amount of yardage for which payment is in dis *152 pute in this case is stipulated to be 163,211.83 cubic yards. This is the full amount of embankment placed in the stripped area between the base of the levee and ground level existing prior to stripping throughout levees L-33 and Lr-37 and for which plaintiff claims it has received no payment.
15. Specification 1-07 (a), referred to above and quoted in finding 6, the interpretation of which is in issue here, was written by O. K. Albright, a registered engineer, long an employee of the Corps of Engineers and head of the levee and waterways section in the design branch of the engineering division of the Jacksonville district. Prior to service with the defendant he had experience as a civil engineer. Fourteen years of his experience with the defendant has been in connection with the planning, design and construction of levees. In preparing the specifications, made a part of the contract here, he gave consideration to numerous elements of work involved. One of the elements he considered was the matter of “backfilling” the base of the levee after it had been stripped of vegetation. This does not appear in the contract and he explained this by saying that many operations, such as clearing, stripping and backfilling, had to be performed, but that it was not practical to pay separately for each one of them. He considered the back-filling as part of the embankment and as normal procedure for constructing a levee and that the difficulty of it would be evaluated by the bidders. He contemplated that the cost of that operation would be included in payment for the embankment above the natural ground surface and was of the opinion that he had made this clear in the language of the specifications wherein it is provided, as noted in finding 4, that the “cost of the work, including all incidentals, shall be included in the unit prices quoted by the Contractor in his bid.” He considered natural ground surface, as used in the specifications, to mean the ground as it existed at the time the contractor moved onto the site and disturbed it and that when he did so the construction commenced. He regarded construction as including all of the work necessary for the project (except surveying) and -thus including clearing and stripping. These views of this witness were not made known to plaintiff except as reflected by the language *153 of tbe contract documents. Defendant’s interpretations of the contract specifications were corroborated by one of the defendant’s witnesses, an unsuccessful bidder, and repudiated by plaintiff’s witnesses who prepared bids but did not submit them.
16. The plans, made a part of the contract, contained a drawing of a typical cross section and thereon was a “probing legend” which indicated that the hatched line was “existing ground surface.” The base or bottom of the levee is indicated by a solid, broken line. The area between these two lines was indicated to be “the base to be stripped.” The witnesses testified that the prescribed construction cross section within the meaning of the contract was the perimeter of the cross section from the point of the toes to the prescribed slopes and crown. However, the defendant’s witnesses differed with those of plaintiff as to where the toe was deemed to be. The plaintiff, as heretofore indicated, took the position that the toe was at the bottom of the area tó be stripped whereas defendant’s position is that the toe is higher, namely, at the existing ground surface. The latter phrase is not used in the specifications, which provided for payment based upon the natural ground surface, as indicated in paragraph 1-07, sufra. Unknown to plaintiff at the time of the making of the contract, defendant considered both terms to be synonymous and to refer to undisturbed ground. Defendant makes reference to paragraph 1-06 of the specifications to support its interpretation.
To plaintiff, the fact that the specifications refer to natural ground surface and the plans to existing ground surface indicates that defendant intended to convey to the contractor that the measurement for embankment was to be made from some point other than the existing ground surface, namely, the natural ground surface after stripping. Otherwise, plaintiff says, defendant would not have used two different terms. The weight of plaintiff’s evidence defines “natural ground” as that part of the earth having natural properties, as opposed to artificial, synthetic or constructed ground. It may be uneven or level, dry or under water, and the fact that the top layer of dirt, vegetation or water is cleared away does not affect its status as natural ground surface.
*154 17. In drafting these specifications, the defendant departed from the corresponding provision in prior contracts. In specification 1-07 defendant intended that payment was to be made for embankment above the natural ground surface, whereas in prior specifications it had provided for payment from the surface of the base of the levee after stripping. This is illustrated by the contract for the similar levees D-35 and L-36, which was also held and performed by plaintiff. That contract, dated February 23, 1950, provided in paragraph TP-12, as follows:
tp-12 MEASUREMENT and patment. — a. Clearing yC ‡ ¥
b. L-35 and L-36. * * *
o. Peat. — L-36 * * *
d. Embanlcment. — L-35 and L-36. — This item shall be measured by the cubic yard in place in the levee fill. Surfaces to receive the fill will be measured after the levee foundation has been stripped and the peat portion of core has been constructed. The volume between these surfaces and the surface of the crown and side slopes, subject to limiting tolerances in grade, of the completed levee will be paid for at the contract price per cubic yard. * * *
In December 1949, the Government let the contract for the construction of levee L-35A. Plaintiff bid on this contract, but was not the low bidder, and it was awarded to another company. Paragraph TP-5 of these specifications provided as follows:
TP-5 MEASUREMENT AND PATMENT.-
Item 1. Stripping, * * *
Item 2. Excavation — Peat. * * *
Item 3. Embankment. — Shall be measured by the cubic yard in place in the levee fill by computing the volume between surface of the levee foundation (after stripping operations) and the crown and side slope surfaces of the levee embankment after it has been completed, as determined by cross sections shown by surveys made before filling operations are commenced and after the levee is completed in any acceptance section; excluding, however, the volume of all fill deposited outside of the tolerance lines specified. Payment shall be made at the contract emit price per cubic yard. Payment under this item shall include all costs connected with the excavation of embankment materials and with *155 the construction of the levee embankment, not specifically included in the other items of work.
Both of the above-described contracts provided for unit price payments for the stripping and excavation as well as for the embankment, whereas the contract involved in this suit provided only for unit price payment of the embankment placed, as described in finding 6.
18. The schedule on which bids were invited contained 26 items comprising- the total bid price. The largest single item was item 1 on embankment, which is the item involved in the major claim in this suit. On this item, the invitation called for unit-price bids, per cubic yard, on an estimated quantity of 2,100,000 cubic yards. The defendant’s estimated unit cost for embankment was 42.7 cents per cubic yard. The bids of the three lowest bidders on this item were as follows:

19. With respect to item 1 on embankment, the defendant’s cost estimate was based on 2,550,000 cubic yards of embankment computed as follows:

Cubic yarda

The cost of moving and placing 2,550,000 cubic yards was computed, but, in order to arrive at an estimated unit cost, the total costs for the 2,550,000 cubic yards were spread over only 2,100,000 cubic yards. This was done because the specifications provided, in paragraph 1-03, that the base of the levee had to be stripped of surface vegetation, and, in paragraph 1-07, that payment was to be made only for embankment above the natural ground level. The 2,100,000 cubic yards was the estimated quantity of embankment above that level, as understood by defendant, so the Government esti *156 mate added to the estimated cubic yardage of embankment an allowance for refilling the stripped-out area in the amount of 250,000 cubic yards and for shrinkage, 200,000 cubic yards,[1] making an estimated total of 2,550,000 cubic yards to be moved and placed. It then computed the estimated cost of moving 2,550,000 cubic yards, and, in order to arrive at an estimated price per cubic yard, divided the estimated cost of moving and handling 2,550,000 cubic yards by only 2,100,000, the estimated yardage above the natural ground level. Thus, the defendant’s estimated unit price per yard, applicable only to the cubic yardage above the natural ground level, nevertheless included the estimated costs of refilling the stripped-out area. The steps it took in making its estimate of cost and in applying the specifications in this manner appear on the face of the written estimate itself, defendant’s exhibit 1. The evidence is conflicting as to whether plaintiff saw this estimate prior to its protest. The weight of the evidence is that it did not. It did see the abstract of bids, which, as to the defendant’s estimate on embankment, included only the defendant’s estimate of 42.7 cents per cubic yard for 2,100,000 cubic yards at a cost of $896,700.
20. In preparing its bid price on the item designated “embankment” in the bid form, the plaintiff followed a procedure somewhat similar to that followed by the defendant in computing its estimate of the cost. In computing its bid price, plaintiff started with the estimated quantity of 2,100,000 cubic yards and then added to that quantity an allowance of 25 percent, or 525,000 cubic yards, which was described as an allowance for shrinkage. Plaintiff then computed its costs for a total of 2,625,000 cubic yards but its bid price to the defendant, in response to the invitation to bid, was, nevertheless, quoted as a unit price per cubic yard for only 2,100,000. Thus, while plaintiff says it did not make an *157 allowance for backfilling the stripped area, as defendant did in its estimate, nevertheless plaintiff’s total allowance exceeded defendant’s 75,000 cubic yards. Plaintiff has been paid for 1,833,906 cubic yards placed in the levee but claims an additional 163,211.83 cubic yards placed in the stripped area, or a total of 1,997,117.83 cubic yards which is, as seen above, less than the estimated yardage on which the bid was computed. Defendant asserts the affirmative defense that under the contract and specifications plaintiff has already been compensated for the backfilling of the stripped area in the unit price paid for the levee constructed above the natural ground surface.
21. Plaintiff produced, as witnesses, representatives of two construction companies who had prepared bids on this work, but which were not actually filed with the defendant. Both of these contractors followed the same basic procedure in computing their bid on embankment as that followed by the plaintiff in computing its estimated cost.
One company, Troup Brothers, Incorporated, in computing its bid on embankment, took 2,100,000 cubic yards, the estimated quantity stated in the invitation for bids, and added to that an allowance of about 25 percent for shrinkage, giving a total cubic yardage of 2,625,000 on which to compute costs. After computing the costs of 2,625,000 cubic yards, it divided that by 2,100,000 cubic yards in order to arrive at the unit cost figure to be submitted as its bid. In other words, its bid price per cubic yard for the estimated 2,100,000 cubic yards set forth in the invitation for bids was actually a unit price which, if it were paid for 2,100,000 cubic yards, would actually compensate it for 2,625,000 cubic yards of borrow material. Stated another way, its unit price was computed in such a manner that the compensation it would receive for one “pay” yard would actually compensate it for V/^ cubic yards moved and handled.
The other company, Reynolds & Smith, Inc., followed the same formula. It also added for shrinkage about 25 percent, or 525,000 cubic yards, to the estimated quantity of 2,100,000 stated in the invitation and then computed its price for 2,625,000 cubic yards, but spread those costs over only 2,100,000 in order to arrive at the unit price, which *158 it would have bid had a bid on this work been submitted. Its unit price per cubic yard for the estimated 2,100,000 cubic yards of embankment, had it submitted its bid, been awarded the contract and been paid for 2,100,000, would likewise have compensated it for 2,625,000 cubic yards moved and handled.
22. The defendant produced as a witness the representative of Robert Lee, Inc., who had prepared the bid submitted by that company. This company was the second lowest bidder, its bid being only about $8,600, or one-half of one percent higher than the bid submitted by plaintiff. This company also followed the basic formula outlined above. It added about 20 percent, or approximately 400,000 cubic yards, to the estimated 2,100,000 cubic yards set forth in the invitation for bids. This gave the total quantity of material it would have been required to move in order to construct the levee. It then computed its unit cost for that quantity, but, since its bid was on only an estimated 2,100,000 cubic yards, it increased its unit price for that quantity proportionately, so that payment for 2,100,000 cubic yards at the unit price it bid would compensate it for 2,500,000 cubic yards actually moved.
This witness testified that he understood the specifications to mean that the contractor would be paid only for embankment above the original or natural ground level and that it would not be paid directly for refilling the stripped area back to that level. But, he failed to make any shrinkage allowance in his estimate for the quantity of stripped materials to be replaced, which the defendant estimated at 250,000 cubic yards. A 20 percent shrinkage allowance on the latter quantity would increase the total for that purpose by another 50,000 cubic yards.[2]
*159 23. Plaintiff completed the contract on February 6, 1952. It was duly paid, at the contract unit price, for 1,833,906 cubic yards of embankment placed in the levee above the original ground level, but was not and has not been paid for the 163,211.83 cubic yards representing material between that level and the surface after stripping. On February 18, 1952, after completion of the contract, plaintiff made a request for payment of this yardage.[3] The request was denied by letter of March 7,1952. By letter dated March 13,1952, plaintiff requested that defendant’s letter of March 7, 1952, “be amended to provide for payment for all of the material placed in the embankment above and bottom of the stripping excavation.” [sic]. This request was denied by letter of March 26, 1952, which invited plaintiff’s attention to the disputes article of the contract, article 6, pursuant to which it could appeal this decision to the Chief of Engineers within 30 days. By letter dated April 3, 1952, plaintiff acknowledged receipt of the letter of March 26, 1952, stated that article 6 of the contract had been deleted, and advised that it intended to appeal to the Chief of Engineers for payment, By letter dated April 10, 1952, plaintiff was advised that the disputes article had not been deleted from the contract, and that it appeared on page 10 (a).
This letter again invited plaintiff’s attention to the provisions of article 6, “whereby you may appeal my decision of 26 March 1952 to the Chief of Engineers within 30 days from said date * * and stated, “Advice of your intention [to appeal] is not construed to be a notice of appeal.” By letter dated June 25, 1952, plaintiff protested the decision relative to its claim for additional payment for embankment. By letter dated June 27, 1952, the district engineer reviewed the above-recited steps and stated: “As no appeal was submitted by you within 30 days from said date, *160 this office can take no further action on the matter under the terms of the contract.”
24. Plaintiff subsequently appealed its embankment claim to the Chief of Engineers, represented by the Corps of Engineers Claims and Appeals Board. The Government moved to dismiss the appeal on the grounds that it had not been timely taken. The motion was denied and the case heard, considered, and decided adversely to plaintiff by the board, its written decision therein being rendered August 19,1955.
The board considered the meaning of the phrases “natural ground surface” and “last survey made before construction commences,” which it considered to be the key phrases of paragraph 1-07 of the specifications, out of which the controversy arose. It held, in its written opinion, that the phrase “natural ground surface” necessarily meant the surface as it lies in nature prior to being disturbed by construction operations. It pointed out that the natural ground surface cannot mean the surface after the natural or existing ground has been cleared of vegetation and stripped. These operations, it stated, removed the soil, and after removal, the surface must, of necessity, be altered and different from what it was in its natural state prior to the excavation.
With respect to the matter as to when construction commences, it stated that normally it was the time when physical steps are taken at the site; that, traditionally, it is when the first spade of earth is turned; that in the context of this specification it clearly is that time when physical work commences that is required by the contract; and that “Certainly clearing and stripping is physical work at the site required by the terms of this contract.”
In denying the appeal, the board stated, in part, as follows:
We find nothing unusual or arbitrary in the mode of payment prescribed here. Payment for many ancillary operations are included as a matter of course in pay items of construction contracts. And arbitrary methods of measurement of the quantity is not an uncommon procedure. Were it otherwise, measurement for pay purposes would be unduly complicated and detailed. Having contracted with notice as to how this item would be measured in this contract appellant can *161 not now complain that another method was not selected.
25. If, as a matter of law, plaintiff is entitled to recover for the 163,211.83 cubic yards of embankment placed in the stripped area of the levee, plaintiff would be entitled to be paid for this yardage at 54 cents per cubic yard, or a total of $88,134.39.[4]
CLAIM FOR RECOVERY OE LIQUIDATED DAMAGES
26. Paragraphs SC-1 and SC-2 of the specifications, quoted in finding 5, provide for liquidated damages at the rate of $200 per day if the work is not completed within a certain time. Plaintiff was required to prosecute the work at an average rate of not less than 250,000 cubic yards per month. The work was to be commenced within 30 days after receipt of the notice to proceed. With respect to the completion date, the specifications required that the contractor was “to complete this portion of the work [embankment] within the number of days after the limiting date set for commencement as determined by applying the average monthly rate above stipulated [250,000 cubic yards per month] to the total quantity of material actually placed and to be paid for under the contract; * * The total amount of material placed, including the amount necessary to refill the stripped-out area, amounted to 1,997,117 cubic yards (1,833,906 cubic yards plus 163,211 cubic yards). This quantity divided by 250,000 per month equals 8 months.
Based on the defendant’s interpretation of the specifications, as explained in detail in preceding findings, the plaintiff received direct payment for 1,833’,906 cubic yards, the quantity above the natural ground surface, as that term was understood and applied by the defendant. This quantity divided by 250,000 cubic yards equals 7.33 months (7 months, 10 days).
Notice to proceed was received by plaintiff April 5, 1951, with the last day to commence work being May 5, 1951. Based on the quantity of yardage for which plaintiff was paid, the completion date thereby became December 14, 1951. *162 However, by modification 4, the completion date was extended 26 calendar days, thereby fixing it as January 9,1952.
Based on the larger quantity of 1,997,117 cubic yards, the time allowed for completion, as stated above, was 8 months, so the completion date thus became January 4,1952, to which the 26 days allowed by modification 4, should be added, making the extended completion date January 30, 1952.
Work was actually completed February 6, 1952. Based on the yardage for which it was paid, plaintiff was 28 days late in completing the work (January 10 through February 6, 1952). For this period it was assessed liquidated damages of $5,200 (26 days x $200 per day), although, based on 28 days, the correct sum would have been $5,600. There is no counterclaim for this difference.
Based on the total yardage placed, the plaintiff was 7 days late in completing the work (January 31 through February 6, 1952). Liquidated damages for this delay would amount to $1,400.
If, as a matter of law, plaintiff is entitled to recover on its embankment claim it would be entitled to a refund of $3,800 in liquidated damages assessed as described above.
CLAIM EOR RENTAL POR STANDBY TIME OE EQUIPMENT
27. Pertinent provisions of the contract and specifications relating to this item of plaintiff’s claim are as follows:
1-04 embankment— * * *
e. ¡Surface compaction. — (1) Initial compaction.— After dressing, the levee crown and slopes shall be compacted by approximately four passes of a caterpillar-type tractor weighing not less than 16 tons. A pass is defined as one complete coverage by the tractor tracks. The exact number of passes may vary in different sections of the levee and m all cases the number of passes will be as directed by the Contracting Officer.
(2) Additional compaction. — Additional compaction by pneumatic-tired rollers may be required, but determination as to this cannot be made until the nature and condition of the levee surface have been observed. The Contractor will therefore be required to have at his disposal equipment as described below, which will be operated if, and to the extent, directed by the Contracting Officer. The number of hours listed in the bid form for each type of roller is for purposes of comparing bids *163 only, and the right is reserved to omit use of the rollers entirely or to increase the time of operations to any amount which may be required. Payment for mobilization and demobilization of this equipment will be made if the Contractor is directed to place it on the work site, and payment for its use will be made for such time as it is used as directed.
Either of two types of rollers may be required, as follows: (a) a roller having 9 or 13 wheels (on 2 axles) equipped with low pressure tires and capable of carrying a load of approximately one ton per wheel, or (b) a roller having at least two wheels loaded to 25,000 Sounds each. If the first type of roller used proves to e impractical, or does not produce satisfactory results, the Contractor may be required to change to the other type. Loading shall be as directed by the Contracting Officer.
A roller unit is considered to consist of one of the rollers described above, complete with power unit and all auxiliary equipment necessary to its successful operation on the crown and side slopes of the levee, and necessary operating personnel. The Contractor shall also furnish all fuel, lubricants, repairs, ballast, etc. necessary for satisfactory operation.
All compaction by rollers must be accomplished during daylight hours, unless such work is specifically authorized at night.
* i\i * * *
1-07 MEASUREMENT AND PAYMENT.- * * *
5. Initial compaction. — Initial compaction will be paid for on the basis of operating time of the tractor. Operating time will be measured to the nearest quarter-hour and shall include all time during which the tractor is compacting under the direction of the Contracting Officer, including time of maneuvering and moving from place to place on the work. Time lost on account of repairs, lack of competent operating personnel, unsatisfactory working conditions, and time during which operation of the tractor is not required, will not be paid for. Payment at the contract price for this item shall include the cost of all fuel, operating personnel and other incidentals necessary for the successful operation of the tractor.
c. Additional compaction. — Payment for this work will be made on the bases described below, for either or both types of roller unit which the Contractor may be directed to place on the work. Payment for mobilization and demobilization of the roller unit, or units will *164 be made at the appropriate contract lump sum price or prices, for “Mobilization and Demobilization;” payment for operation of the roller unit, or units, will be made at the appropriate contract unit price, or prices, for “Additional compaction.” Operating time will be counted to the nearest quarter-hour, and shall include all time during which a roller unit is operating under the direction of the Contracting Officer, including time of maneuvering and moving from place to place on the work. A minimum of four hours time will be paid for on any day in which a unit is put into operation but in which work is discontinued by direction of the Contracting Officer prior to completion of four hours work. Time lost on account of repairs, lack of competent operating personnel, unsatisfactory working conditions, and time during which operation of the unit is not required, will not be paid for.
$ $ $ ‡ H*
go — 9 SUSPENSION op work. — The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed the Contractor, provided, however, that the suspension was not due to the fault or negligence of the Contractor.
28. Defendant, by letter under date of June 29, 1951, confirmed an oral instruction given to plaintiff on June 26, 1951, directing it to suspend all compaction operations under the contract until further notice. The suspension continued in effect until September 18, 1951. Defendant required plaintiff to keep its equipment on the job during the suspension, except for 15 days when employed on the work. Plaintiff here claims $4,649.80 [5] for 67 days of the suspension period, *165 the claim being on the basis of $12.50 per hour rental at 10 hours per day, less operating costs of $3,725.20.
' 29. Because of a change in the method of compaction the defendant on August 10, 1951, asked plaintiff for a quotation on the cost of doing it the new way and proposed to modify the contract by deleting the balance of the estimated number of hours of compaction. In a letter dated August 22, 1951, plaintiff submitted a quotation as requested. On September 17, 1951, defendant wrote plaintiff that the unit prices quoted were unreasonable, in its opinion, and that it was proposed to circulate invitations for bids for the work and to delete from plaintiff’s contract, by modification thereof, the initial and additional compaction not performed. Accordingly, contract modification 3, dated October 5,1951, was prepared and submitted to plaintiff for execution. Plaintiff signed it “under protest.” On December 8, 1951, defendant advised plaintiff by letter that the addition of the words “Signed under protest” nullified the agreement and plaintiff’s attention was directed to article 26 of the contract, titled “Termination for Convenience of the Government.” Plaintiff was invited to inform the contracting officer of the reasons for the protest and to state the procedure plaintiff wished to follow in effecting a partial termination.
30. On January 10, 1952, plaintiff advised defendant as follows:
Our reason for signing this Supplemental Agreement under protest was that we had gone to an expense of buying and assembling an attachment on a Caterpillar D8 tractor for the purpose of pulling roller. We certainly would not have gone to this expense if we had not had the contract for rolling. This attachment cost us over ten thousand dollars and is of very little value to us. We also had the Caterpillar D8 tractor, which this attachment is on, standing by. The tractor and the attachment cost approximately $28,000.00.
We believe that we are entitled to some consideration for this piece of equipment which has been on the job throughout our contract * * *.
31. To the plaintiff’s letter above the contracting officer replied on January 19, 1952, as follows:
*166 Receipt is acknowledged of your letter1 dated 10 January with further reference to Modification No. 3, your contract No. DA-08-123-Eng-618, providing for the deletion of the initial and additional compaction which was not performed by you up to 26 June 1951, under contract items 2 and 3. You state that certain costs have been incurred by you in connection with the compaction features of your contract and request consideration of these costs in the preparation of the contract modification.
In accordance with the provisions of paragraph GC-9 of the contract specifications you were directed on 26 June 1951 to suspend work under Item 2 and Item 3 (b), (c), and (d), of Schedule I of the contract for the reason that it was found necessary to change the method of compacting the levee slopes. Specifications for the changed method of compaction were furnished to you with a request that you quote prices for performing the compaction operations in accordance therewith in lieu of the method originally specified. The prices submitted by your letter of 22 August 1951 were greatly in excess of the Government’s estimate of reasonable costs for the work. In view thereof you were informed by letter dated 17 September 1951 that all work not performed by you under Items 2, 3 (a), (b), (c), and (d) of the contract schedule would be deleted from the contract.
Performance of work under the referenced items was therefore suspended during the period 26 June to 18 September 1951. After 18 September 1951 you were not required to retain any compaction equipment on the job. Paragraph GC-9 of the contract specifications provides “* * * In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. * * *” You are therefore requested to submit a detailed breakdown of any additional expense or loss which you may have incurred due to suspension of the compaction items of your contract, and finally the deletion of the items from the contract. Please submit same to the Resident Engineer, Corps of Engineers, Clewiston, Florida, as soon as possible for review and forwarding to this office.
It will be appreciated if you will expedite your reply in order that the contract modification agreement *167 may be executed and your contract placed on a current basis.
' 32. On January 25, 1952, plaintiff submitted an invoice for $5,348.92 revised by another invoice dated February 12, 1952, to a lower sum of $4,996.80.[6] Plaintiff advised that it had to pay $15 per hour for tractors on a job at Pine Castle, Florida, at the time its tractor on the levee job here was standing idle awaiting defendant’s decision on the rolling. Operating costs were deducted by plaintiff on the invoice, ■however. The contracting officer, oh March 1, 1952, made reference to plaintiff’s invoice in a letter in which hó took the position that $2,828.94 would be a more, reasonable settlement of the issue and invited plaintiff to advise by March 7, 1952, whether such an amount would be acceptable. Defendant based its figure on a computation arrived at by relying on the Associated General Contractors’ equipment-ownership expense schedule and a monthly rate of $1,266.70 for 67 days. Plaintiff rejected defendant’s suggestion and computation by letter of March 10, 1952. The defendant then advised plaintiff by letter on March 26, 1952, that there was no provision in the contract and specifications whereby plaintiff could be paid for other than actual hours of use of the compaction equipment. The specifications set forth in finding 27 were quoted to plaintiff and it was urged that plaintiff execute modification 3 without qualification. However, it was stated that if this modification was still unacceptable plaintiff would have 30 days under article 6 of the contract within which to- appeal to the Chief of Engineers. To this letter plaintiff replied on April 23,1952, stating that it had been uncertain how to reply to defendant; that its president, Mr. Hooper, had telephoned the Jacksonville office of defendant, no daté being given; that the $2,828.94 would be accepted in lieu of court action, but pointing out that defendant’s letter- of March 26 said that no allowance could be made for equipment standing by under certain conditions of the specifications. No reference was made to any appeal under article 6 but defendant was asked to reply. Plaintiff again sought a reply by letter to defend *168 ant on May 22,1952. In the meantime, defendant had written plaintiff. It has not been established that plaintiff received this letter. It does, however, state defendant’s position. The letter, dated June 29, 1952, reads as follows:
Eeceipt is acknowledged of your letter dated 28 April 1952 which is in reply to my letter dated 26 March 1952 informing you that there are no provisions of your contract No. DA-08-123-Eng-618 whereby any payment could be made for the compaction units except for the actual hours the equipment was used.
You were also informed by my letter dated 26 March 1952 of your right to appeal my decision within 30 days as provided by Article 6 of the contract. Your letter dated 23 April 1952 does not appeal my decision.
You are therefore informed that the 30-day period allowed for appeal has expired and that the proposed Modification No. 3 to your contract has been cancelled. Payment has been made to you for the unit hours the equipment actually was used as provided by Items 2 and 3 (b) of the contract payment schedule and no further payments will be made under those items. Full payment has also been made under Item 3 (a) of the payment schedule. You were not required to perform any work under Items 3 (c) and (d) of the payment schedule.
Plaintiff claims that on September 5, 1952, he orally agreed with defendant’s representatives that they would offer and plaintiff would accept $2,828.94, as originally suggested by defendant on March 1,1952, the same having been earlier rejected. But no such arrangement was effected and plaintiff does not now rely on it.
33. Plaintiff sought to appeal this claim, as well as its embankment claim, to the Corps of Engineers Claims and Appeals Board. By its decision of August 19, 1955, the board held, with respect to the compaction claim, that there had been no appeal from the contracting officer’s decision and that it lacked jurisdiction to consider the matter. The board said that the record of the controversy would not be before it, as there had been no appeal, except for the fact that the parties had agreed that the record on the compaction matter would be submitted in connection with the embankment claim. The board then recited the plaintiff’s position as follows:
*169 Counsel for the appellant contends that there has been no decision by the contracting officer from which an appeal was necessary because:
a. The letter of 26 March 1952, which purported to require an appeal, was signed by Colonel Schull in his capacity of District Engineer as distinguished from successor contracting officer.
b. There was no dispute on the date of the alleged decision as the matter had been previously settled by an oral but obligatory agreement.
c. The alleged decision did not state any facts which the appellant disputes and for that reason there was no factual dispute requiring an appeal.
d. Action of the parties subsequent to the alleged decision shows that the action of the District Engineer was not a “final action” requiring an appeal.
e. The conferences at the District Engineer’s offices culminated on 5 September 1952 in a second obligatory oral agreement settling the claim.
The appellant urges the Board to instruct the contracting officer that the terms of the contract, when properly interpreted under the undisputed facts, permit payment of the sum agreed upon, and that such payment and should be made notwithstanding all that has gone before.
34. Defendant contends that in the event the court finds it liable on this item of the claim, its liability does not exceed $2,043. The equipment for which plaintiff claims rental in the amount of $4,649.80, covering 67 days of suspension of its use for additional compaction, is a D8 tractor and a roller of 50,000 pounds of weight with a boom and sprinHer attachment. The total cost of this equipment is found to be $28,000 for the D8 tractor with roller attachments and $5,000 for the roller itself. In supporting its position defendant relies on the standby time, ownership and expense tables published by the Associated General Contractors of America. These are not rental schedules but rather contain statistical data, based on the average expenses of contractors throughout the country, as to the life of various pieces of construction machinery, average months of use per year, depreciation, costs of overhaul, major repairs, painting, taxes, storage and insurance. The expense schedule is expressed in terms of percentages of original capital investment. The schedule used by the defendant *170 in its computation was tbe 1949 schedule as revised in 1951. It listed the D8 tractor but not the roller. Defendant used the data for a similar type of roller but smaller than the one plaintiff used.
35. The monthly ownership and standby expense of the D8 tractor and roller, based on the Associated General Contractors’ tables referred to above, amounts to $2,089, calculated as follows:

36. Defendant makes certain reductions in the net suspension period of 67 days. Defendant takes off 19 days on the basis of plaintiff’s alleged failure to reply within 10 days to its letter of August 10, 1951, referred to in finding 29. Plaintiff’s reply was dated August 22 but for reasons not satisfactorily explained by the evidence, defendant claims it did not receive the reply until September 8, 1951, and that the interim represented a period of standby time not caused by any act of defendant. This would leave a net period of 48 days, which at $2,089 per month amounts to $3,342.40. However, because the evidence shows that the D8 tractor was used intermittently by plaintiff on other phases of the work during the period when compaction was suspended, the exact time not being established, defendant assumes it was so used about half time and in its computations makes a corresponding deduction which amounts to $1,299.20, being 0.8 months (24 days) x $1,624, the monthly ownership and standby expense of the tractor. This sum deducted from $3,342.40 leaves a net sum of $2,043.20 re *171 ferred to above. Without the deductions asserted by defendant but using defendant’s method of computation at the rate of $2,089 per month for 67 days would give the sum of $4,665.42 as compared to plaintiff’s claim of $4,649.80 based on its estimate of a fair rental. The assumptions upon which defendant bases its deductions are not supported by the evidence.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Defendant’s allowance for shrinkage Is about 8.5 percent of the total of the estimated 2,100,000 cubic yards of embankment and the defendant’s allowance of 250,000 cubic yards for stripping replacement or backfill. This allowance may be compared to the 20 percent allowed by defendant’s witness referred to in finding 22 and to the 25 percent allowed by plaintiff and his witnesses as set forth in the next two findings. The matter of what to allow for shrinkage is within the Judgment of an individual contractor but usually runs from 20 percent to 25 percent of the material placed.

 Defendant offered to produce cumulative testimony from the Cook Construction Company, another bidder, to show that this bidder interpreted the specifications in the same manner as Robert Lee, Inc., and made an appropriate allowance for both shrinkage and backfilling the stripped area.
Defendant also made an offer of proof for surrebuttal to show that although plaintiff had made an allowance for shrinkage adequate to cover backfill and has presumably therefore been compensated for this backfill that actually there was no shrinkage and that the total fill material handled by plaintiff, including all nonpay yardage, in order to receive pay for one cubic yard in place in the levee above the natural ground level, was substantially less than 1.25 cubic yards. As to this defendant stated that it could show “that a total of only 1.21 cubic yards of material was required to net 1 cubic yard *159 for pay purposes. Since this 1.21 includes the backfill material in issue and since plaintiff contemplated and based its bid on having to produce 1.25 cubic yards in order to net 1 cubic yard for pay purposes, it is quite apparent that the available evidence which defendant desires to present will prove that plaintiff’s allowance embraced the backfill material, and that it has been paid for it, all as contemplated by the contract * *

 Plaintiff actually claimed for 166,671 cubic yards and does so in its petition but, as previously noted, the figure of 163,211.83 cubic yards is now stipulated as the accurate figure.

 The petition claims $90,002.34 based on 166,671 cubic yards at 54 cents per cubic yard.

 The petition asserts $4,996.80 due on this Item but this Is modified by plaintiff’s evidence as stated above.

 On February 12, 1952, plaintiff -was awarded á contract pursuant to invitation to bid dated January 21, 1952, and did the work thereunder.